**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| Ross Christensen, | Case No. 8:23-cv-268 |
| Plaintiff, | |
| v. | **COMPLAINT**<br>**JURY TRIAL DEMANDED** |
| Union Pacific Railroad Co., | |
| Defendant. | |

Plaintiff Ross Christensen ("Christensen") files this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages resulting from its violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as amended ("ADA").

## PRELIMINARY STATEMENT

1.    Beginning in 2014, Union Pacific implemented company-wide changes to its fitness-for-duty program ("Fitness-for-Duty"). As a result of these changes, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions—even when the condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy that automatically removes employees who disclose health conditions, or who Union Pacific suspects may have health conditions, from service. Union Pacific then subjects the employee to a Fitness-for-Duty evaluation, again regardless of whether the employee has been safely performing the essential functions of his or her job. These evaluations do not assess whether an employee is capable of performing the essential functions of his or her

position, and Union Pacific does not conduct physical examinations of employees. Furthermore, Union Pacific routinely disregards the opinions of outside doctors who do conduct physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee and conducts a "file review," regularly and arbitrarily concluding that the employee is unfit for duty because of a disability, and issuing unnecessary work restrictions it then refuses to accommodate.

2.      In February 2016, several Union Pacific employees commenced a class-action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.). The District of Nebraska certified the class in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

3.      Christensen is a victim of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Despite being qualified and safely performing his job without incident, Christensen was removed from service for a Fitness-for-Duty evaluation under the new program and excluded from work at Union Pacific because of a disability. Christensen was a class member in *Harris*, and now timely brings this individual legal action.

<strong><u>JURISDICTION AND VENUE</u></strong>

4.      This Court has jurisdiction under 28 U.S.C. § 1331 because Union Pacific violated the ADA.

2

5.     Venue is proper under 28 U.S.C. § 1391(b)(1), because Defendant is headquartered in Omaha, Nebraska.

6.     Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because unlawful employment practices were committed by Union Pacific in Omaha, Nebraska, because employment records relevant to Defendant's unlawful employment practices are maintained and administered in Omaha, Nebraska, and because Union Pacific's principal office is in Omaha, Nebraska.

## THE PARTIES

7.     Christensen resides in Payson, Utah. He was an employee of Union Pacific, working in Provo, Utah.

8.     Union Pacific is a railroad carrier engaged in interstate commerce and has operations in Provo, Utah, and is headquartered in Omaha, Nebraska.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

9.     Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

10.     The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services and Mechanical positions), and Dispatcher positions disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific labels as "Reportable Health Events" (Exhibit A.) This includes, but is not limited to, stroke.

3

11.     Union Pacific's Fitness-for-Duty and "Reportable Health Events" policies are even broader in practice than the Medical Rules reflect. Union Pacific routinely triggers the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of their jobs, simply because Union Pacific learns or suspects that the employee has, or has had in the past, a listed or non-listed health condition, or because a manager refers the employee to Health and Medical Services based on a belief that an employee may have such a health condition.

12.     Union Pacific also maintains other unlawful policies and qualification standards related to Fitness-for Duty that are not included within the Medical Rules. For example, Union Pacific uses a "1% rule" that disqualifies from service any employee who Union Pacific suspects or believes may be at more than a 1% risk of sudden incapacitation. Union Pacific also requires employees to undergo exercise tolerance testing and then disqualifies from service any employee whose test results are not "normal," based on an indication that the employee may have a cardiac condition, however minor. On information and belief, Union Pacific maintains other, similar policies that it uses to screen out employees with disabilities for failing to meet a discriminatory qualification standard.

13.     When a Fitness-for-Duty evaluation is triggered, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

4

(Exhibit A.)

14.     These Fitness-for-Duty evaluations are not individualized assessments of the employee's ability to safely perform the essential functions of the employee's job.

15.     Union Pacific does not directly examine employees during Fitness-For-Duty evaluations.

16.     Union Pacific routinely disregards the opinions of the employee's treating medical provider(s), and other medical providers who have physically examined the employee, and instead makes broad requests for medical information, including medical records, from the employee.

17.     Once Union Pacific receives the medical information, Union Pacific's Health and Medical Services Department, located in Omaha, Nebraska, conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

18.     Union Pacific's Health and Medical Services Department routinely issues Fitness-for-Duty determinations that disqualify employees from their positions because of a disability, even though the disability does not affect the employee's ability to safely perform the essential functions of the employee's job (or other positions for which the employee may also be qualified).

19.     The Health and Medical Services Department also uses discriminatory qualification standards, tests, and/or other criteria to exclude individuals with disabilities from their positions.

20.     When issuing Fitness-for-Duty determinations, the Health and Medical Services department relies on standardized protocols for employees with certain broad

5

categories of health conditions or treatments and assigns standardized work restrictions to employees.

21.     For example, as part of these standardized protocols, the Health and Medical Services Department regularly relied on the Federal Motor Carrier Safety Administration ("FMCSA") 2014 Medical Examiner's Handbook ("2014 Medical Examiner's Handbook"), which the company downloaded from the FMCSA website, to determine which health conditions required work restrictions, which standard restrictions to impose, and how long those restrictions should remain in place.

22.     Union Pacific's then-Chief Medical Officer Doctor John Holland described the 2014 Medical Examiner's Handbook as "one of the sources we think is the best."

23.     The recommendations contained in the 2014 Medical Examiner's Handbook, however, did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce.

24.     In addition, by December 2014, the FMCSA withdrew the 2014 Medical Examiner's Handbook from its website and no longer endorsed it for use for commercial driver certifications. Upon information and belief, the FMCSA never again endorsed the 2014 Medical Examiner's Handbook once it was removed from the website.

25.     By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA removed the Handbook from its website and no longer endorsed its use.

26.     Despite this, Union Pacific continued to rely on the outdated Handbook as a basis to assign standardized work restrictions for its employees, including workers who are not subject to FMCSA medical certification requirements.

6

27. Union Pacific also represented to Courts, including in the *Harris* action, that the 2014 Medical Examiner Handbook was reliable guidance and supported its decisions to impose standardized work restrictions for its employees. For example:

a. "Union Pacific concluded that the 1% level of acceptable risk for sudden incapacitation is consistent with the acceptable risk threshold recommended by the FMCSA Medical Review Board and the 2014 version of the online FMCSA Medical Examiner Handbook[.]" Def.'s Br. in Opp'n to Pl.'s Mot. for Class Certification at 21, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 259 (internal quotations omitted).

b. "In 2014 the FMCSA issued Medical Examiner Handbook (FMCSA 2014) to provide medical examiners guidance for making medical fitness-for-duty recommendations for multiple health conditions that can impair the safety for commercial vehicle drivers. These and other recent FMCSA guidance documents, have served [] as reference materials and a general model for developing the Medical Fitness-for-duty Guidelines presented here." Dr. Holland Rebuttal Expert Report, May 11, 2018, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 249-16.

c. "Since 2014, Union Pacific has relied on the FMCSA's guidelines, as reflected in its Medical Examiner Handbook, in determining whether employees with epilepsy, a single unprovoked seizure, or other seizure risks who work in safety sensitive positions have an unacceptably high seizure risk such that it is appropriate to impose work restrictions." Decl. of Dr. John Holland dated Oct. 2, 2018 at 6, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 261-71.

28. Through its Fitness-For-Duty program, Union Pacific removes employees from service based on medical conditions it learns or believes an employee may have or may have had in the past, whether or not such conditions actually interfere with the employee's ability to perform the essential functions of their position, and without making a good-faith effort to determine whether a reasonable accommodation exists.

29. As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay off work without pay, and many have lost

their livelihoods.

### *PLAINTIFF ROSS CHRISTENSEN*

30.    Christensen was hired by Union Pacific on or about July 25, 2004, as a trainman and subsequently worked as a switchman and brakeman.

31.    Most recently, Christensen worked for Union Pacific as a conductor in Provo, Utah.

32.    Over his decade-long career at Union Pacific, Christensen worked ably in and around trains.

33.    On January 9, 2015, Christensen had a stroke while not at work.  After his stroke, he took medical leave for recovery.

34.    After his recovery period, Christensen sought to return to work in or around mid-2015, triggering a Fitness-For-Duty evaluation.

35.    As a result, Union Pacific requested voluminous medical records and Christensen promptly complied with this request.

36.    Christensen's treating doctors cleared him to return to work with little to no restrictions:

      a.    On January 13, 2015, Dr. Kevin D. Call (Medical Director, stroke services), cleared him to return to work as a conductor in or around the end of February after a week of light duty; and

      b.    On March 3, 2015, Dr. David Cragun (cardiology), cleared him to return to work with no restrictions.

37.    Despite these clearances, Union Pacific gave Christensen work restrictions for sudden incapacitation that he was told could be reviewed in January of 2016.

38.     In 2016, Christensen sought and obtained further clearances from his treating physicians:

    a. On January 11, 2016, Dr. Wade M. Butaud (family medicine), cleared him to return to work, including driving, for the next three months with periodic monitoring.

    b. On January 29, 2016, Dr. Mohammad Enterzari-Taher (neurology), cleared him to return to work, including commercial driving; and

    c. On February 9, 2016, Dr. David Wang(cardiology), cleared him to return to work with no restrictions.

39.     Once again, despite these further clearances, in a "Fitness-for-Duty Determination" memorandum dated March 18, 2016, Union Pacific's Chief Medical Officer, Dr. Holland, restricted Christensen from work for a minimum of five years because of so-called sudden incapacitation risks.

40.     The work restrictions listed in the March 18, 2016 memorandum were as follows: (1) Not to operate company vehicles/on-track or mobile equipment/fork-lifts; (2) Not to work on or near moving trains, freight cars, or locomotives, unless protected by barriers; (3) Not to operate cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee; (4) Not to work at unprotected heights, over 4 feet above the ground; (5) If a new job assignment is considered, then HMS should review the functional job demands to determine if you can safely perform the essential functions of the job.

41.     Dr. Holland also stated in the March 18, 2016, memorandum that Christensen's restrictions were consistent with recommendations from the FMCSA.

42. At no time during Union Pacific's Fitness-for-Duty Determination process, or after, did Dr. Holland or any other doctor affiliated with Union Pacific physically examine Christensen.

43. Upon information and belief, at no time during or after this process did Dr. Holland or any doctor affiliated with Union Pacific speak with any of Christensen's treating doctors, including those who had cleared him to return to work.

44. In a letter dated March 23, 2016, and signed by Terry Owens, Director of Disability Management, Union Pacific further informed Christensen that his "supervising department has been unable to identify a reasonable accommodation" and enclosed a document entitled, "What are my options now that I am unable to return to my railroad job?"

45. As a result of Union Pacific's onerous restrictions, Christensen concluded it would be pointless to continue to seek accommodations from Union Pacific as a conductor or any other position with the company.

46. In the time since, Union Pacific has persisted in its refusal to allow Christensen to return to his job.

47. In or around February of 2018, Christensen sought reconsideration of Union Pacific's decision to apply his work restrictions for five years. On October 30, 2018, Union Pacific sent him a letter denying his request for reconsideration and told him to wait to seek reconsideration again in January 2020.

48. In or around March 4, 2020, Christensen sent medical records to Union Pacific in order to facilitate his return to work. To date, he has heard nothing from Union Pacific regarding his return to work.

49. Christensen has maintained a Class A Commercial Driver's License ("CDL") license for years, even before he had a stroke, and has renewed his license to this day.

50. Since Union Pacific has held him out of service, Christensen has worked for Ault Excavating, LLC, using his CDL as a transport driver, earning less than he did at Union Pacific.

51. Christensen remains capable of working as a conductor or trainman for Union Pacific to this day.

52. On February 19, 2016, counsel for Christensen, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the Western District of Washington, alleging disability discrimination in violation of the ADA, along with state law. The case was thereafter transferred to the District of Nebraska. *See Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.).

53. Because he was a class member in the *Harris* case, Christensen's disability discrimination claims have been subject to tolling during the pendency of litigating the class-wide claims, pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

54. This Court certified the class action in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

55. As a result of *Crown Cork* tolling, Christensen had three hundred (300) days from the date of the Eighth Circuit's order to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Shortly after the Eighth Circuit issued

11

its order reversing class certification, the parties entered into a tolling agreement, extending the statute of limitations for Christensen's and other class members' claims by an additional sixty (60) days. Christensen timely filed a charge of discrimination with the EEOC on April 17, 2020. On June 14, 2023, the EEOC issued a right-to-sue letter. Christensen now timely initiates the present lawsuit.

## CAUSES OF ACTION

### COUNT I

*VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(a)*
*DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

56.     Christensen incorporates the foregoing paragraphs by reference.

57.     The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

58.     At all relevant times, Christensen was an individual with a disability as defined by the ADA.

59.     At all relevant times, Christensen had the requisite skill, experience, education, and other job-related requirements of his position, could perform the essential functions of his position with or without reasonable accommodations, and was therefore a qualified individual under the ADA.

60.     Section 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

61.     Union Pacific discriminated against Christensen on the basis of disability

by, among other things, removing him from service and terminating his employment because of a disability.

62.     Because Union Pacific violated 42 U.S.C. § 12112, Christensen has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Christensen is also entitled to attorneys' fees and costs incurred in connection with these claims.

63.     Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Christensen and others similarly situated. As a result, Christensen is entitled to punitive damages.

## COUNT II

### *VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(b)(6)*
### *DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

64.     Christensen incorporates the foregoing paragraphs by reference.

65.     " '[D]iscriminat[ing] against a qualified individual on the basis of disability' includes…using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]" 42 U.S.C. § 12112(b)(6).

66.     Union Pacific discriminated against Christensen on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its Fitness-For-Duty program and related policies, that are intended to screen out individuals with disabilities, and which did screen out Christensen.

67.     Union Pacific's qualification standards are neither job-related nor consistent

13

with business necessity.

68.     Because Union Pacific violated 42 U.S.C. § 12112, Christensen has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Christensen is also entitled to attorneys' fees and costs incurred in connection with these claims.

69.     Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Christensen and others similarly situated. As a result, Christensen is entitled to punitive damages.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE, Christensen prays for judgment against Union Pacific as follows:**

1.     That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA;

2.     An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3.     For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages in excess of $75,000.00;

4.     Pre-judgment interest, as provided by law;

5.     For Christensen's costs, disbursements and attorneys' fees pursuant to law;

6.     For an award of punitive damages;

7.     For all relief available under the ADA;

14

8.      For such other and further relief available by statute; and

9.      For such other and further relief as the Court deems just and equitable.


Date: June 16, 2023                                          **NICHOLS KASTER, PLLP**

                                                             s/*Laura A. Baures*
                                                             James H. Kaster* (MN # 53946)
                                                                     kaster@nka.com
                                                             Lucas J. Kaster* (MN # 396251)
                                                                     lkaster@nka.com
                                                             Laura A. Baures* (MN # 392081)
                                                                     lbaures@nka.com
                                                             80 South Eighth Street
                                                             4700 IDS Center
                                                             Minneapolis, Minnesota 55402-2242
                                                             Telephone: (612) 256-3200
                                                             Fax: (612) 338-4878

                                                             *Admitted in D. Neb.

                                                             **ATTORNEYS FOR PLAINTIFF**