**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

ROSS CHRISTENSEN,

Plaintiff,

v.

UNION PACIFIC RAILROAD COMPANY,

Defendant.

Case No. 8:23-CV-00268-RFR-MDN

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Ross Christensen ("Plaintiff" or "Christensen") worked for Defendant Union Pacific Railroad Company ("Defendant" or "Union Pacific") as a Trainman/Conductor. A Trainman/Conductor is responsible for operating and routing a train or railcar and is required to perform physical tasks associated with the employee's job duties. This position is a safety-sensitive job, in which it was necessary for Plaintiff to remain alert and vigilant, and failure to do so could result in an injury to himself or someone else. Christensen has admitted that his position with Union Pacific as a Trainman/Conductor involved a duty to his fellow employees regarding safety and that if a locomotive hits a person or object, it could cause serious injury, death, and/or serious damage.

On January 9, 2015, Christensen experienced a left hemispheric ischemic stroke[1], causing him to collapse and lose consciousness. He was taken to Mountain View Hospital, where he was found to have severe aphasia, right hemiparesis, and new atrial fibrillation. On February 25, 2015,

[1] Christensen's ischemic stroke was due to a cardiac embolism from a clot that formed in the heart due to atrial fibrillation and travelled to block the middle cerebral artery. *See* Exhibit C, p. 4. *See also* Ex. E, Christensen Medical Records, UP 00057.

Christensen failed three attempted electro-cardioversions[2] and underwent an ablation procedure[3] on April 30, 2015. On March 18, 2016, Dr. John Holland, Union Pacific's Chief Medical Officer, conducted a complete review of Christensen's medical records, including a review of all records related to the stroke, as part of a Fitness for Duty ("FFD") evaluation. Dr. Holland found that Christensen had residual deficits that would likely interfere with his ability to perform his job, in addition to an unacceptable risk of sudden incapacitation due to the risk of seizures related to his stroke over the following five years. Based on the medical guidelines adopted by the Federal Motor Carrier Safety Administration ("FMCSA"), and the associated medical literature on the risk of seizures and strokes following a stroke, and his medical judgment, Dr. Holland imposed functional work restrictions for five years, which prevented Christensen from returning to his job for that period.

Christensen now alleges that Dr. Holland's decision amounts to discrimination under the Americans with Disabilities Act ("ADA"). Christensen has no evidence of discriminatory animus or that Dr. Holland's decision was based on anything except FMCSA medical guidance and sound medical judgment. Christensen's treating neurologist agreed that a person who suffers from a stroke is at an increased risk of suffering a stroke in the future and that it is impossible to determine the exact risk Christensen faces. Christensen has not provided expert testimony that disagrees with Dr. Holland's medical judgment regarding the length of time the restrictions should have been imposed. Christensen's only evidence to support his claim is from several treating physicians who

---

[2] A cardioversion is a procedure that attempts to use electrical shocks to convert an atrial fibrillation to a normal sinus rhythm. *See* Ex. M, Holland Dep. at 46:9-22.

[3] An ablation is a procedure to treat atrial fibrillation. It uses small burns or freezes heart cells to cause some scarring on the inside of the heart. This helps break up or insulate the electrical signals that cause irregular heartbeats. *See* Atrial fibrillation ablation (2024) Johns Hopkins Medicine. Available at: https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/atrial-fibrillation-ablation#:~:text=Ablation%20is%20a%20procedure%20to,maintain%20a%20normal%20heart%20rhythm. (Accessed: 07 February 2025).

noted he was capable of returning to work without knowledge or evaluation of the tasks required to be performed as a Trainman/Conductor and/or without consideration of the potential for Christensen to suffer a stroke in the future. On that basis alone, Christensen alleges disability discrimination.

Christensen asserts two "disparate treatment" claims. Yet, more than a year of discovery has confirmed that Christensen was not a victim of *intentional* discrimination—Christensen simply disagrees with Union Pacific's medical judgment. Without evidence of animus, prejudice, or pretext, however, Christensen's claims involving differing views on risk and risk tolerance related to medical determinations are not actionable under the ADA.

Despite Christensen's lack of supporting evidence, his ADA claims fail for a host of other independently sufficient reasons:

- Christensen cannot invoke ADA protection because he has no "actual" disability, nor was he "regarded as" disabled by Union Pacific.
- He is not "qualified" because that is measured only at the time of Union Pacific's decision, and Christensen can provide no evidence that Union Pacific's decision to apply restrictions to his employment was unreasonable.
- Both of Christensen's ADA claims fail because of Union Pacific's direct threat defense. Union Pacific has demonstrated that its decision to apply restrictions to Christensen's employment was objectively reasonable.
- Finally, Christensen is unable to provide any facts or evidence supporting a punitive damages claim.

The applicable legal standard is whether Dr. Holland's decision was individualized and objectively reasonable on its own terms—not whether another doctor might reach a different conclusion. Under the applicable standards, the undisputed facts show that no reasonable juror could conclude that Christensen should prevail.

Consequently, Union Pacific respectfully moves the Court under Federal Rule of Civil Procedure 56 for judgment as a matter of law as to all of Christensen's claims, and thus dismissal of his Complaint, with prejudice.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Laney v. City of St. Louis, Mo.*, 56 F.4th 1153, 1155 (8th Cir. 2023). On a motion for summary judgment, "district courts should not 'treat [employment] discrimination [cases] differently from other ultimate questions of fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011). Summary judgment is proper when a plaintiff fails to establish any element of his *prima facie* case under the ADA. *See Kellogg v. Union Pac. R.R. Co.*, 233 F.3d 1083, 1086 (8th Cir. 2000).

As detailed below, under this standard, there are no genuine issues of material fact and Union Pacific is entitled to judgment as a matter of law on all of Christensen's claims.

## III. ARGUMENT

### A. CHRISTENSEN'S ADA CLAIMS FAIL AS A MATTER OF LAW.

The ADA provides that employers shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Here, Christensen alleges disparate treatment claims under both § 12112(a) (Comp. at ¶ 60) and § 12112(b)(6) (*Id.* at ¶ 65). Christensen is unable, as a matter of law, to establish either of these claims.

**1. Christensen's § 12112(a) Claim is Fatally Deficient in Multiple Respects.**

The ADA prohibits discrimination in employment based on a "disability" meeting any of three statutory definitions. 42 U.S.C. §12112(a). A claim for violation of Section 12112(a) is one for "disparate treatment." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016).

At every level, federal courts have stressed that a disparate treatment claim fails without evidence of *discriminatory intent*. "[E]vidence of the employer's subjective intent to discriminate [] is required" for an ADA disparate treatment claim. *Raytheon Co. v. Hernandez*, 540 U.S. 52, 53 (2003). Following the Supreme Court's direction, the Eighth Circuit has held that the claim "requires proof of discriminatory intent." *Withers v. Johnson*, 763 F.3d 998, 1003 (8th Cir. 2014). In fact, such intent is the "key element." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004). This Court is also in alignment. *See Meza v. Union Pac. R.R. Co.*, No. 8:22CV102, 2022 WL 4131359, at *3 (D. Neb. Sept. 12, 2022) (dismissing ADA disparate treatment claims due to an insufficient showing of an intent to discriminate).

An ADA claimant can meet his burden to show the requisite discriminatory intent with either "direct" or "indirect" evidence. *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 545 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 769 (Jan. 10, 2022). Direct evidence shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012). This requires "evidence that clearly points to the presence of an illegal motive." *Id.* "[D]irect evidence of discriminatory intent is rare," *Marzec v. Marsh*, 990 F.2d 393, 395 (8th Cir. 1993), and "[t]he threshold for direct evidence of discrimination is high," *Estes v. The Omaha Sch. Found.*, No. 8:05CV510, 2007 WL 1381760, at *4 n.12 (D. Neb. May 8, 2007). "Direct evidence" reflects

"without inference, a discriminatory bias." *McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009).

"[D]isability discrimination is not concerned with judging whether a medical professional's recommended work restrictions…are right or wrong from a strictly medical standpoint," but "whether there is any evidence of discrimination by the medical professionals in formulating those restrictions." *Goff v. Performance Contractors, Inc.*, No. 18-0529-WS-MU, 2020 WL 1794967, at *12 (S.D. Ala. 2020). Consequently, there is no "direct evidence" of disability discrimination where, as here, an employer merely accounts for the workplace safety-related risks of an employee's health condition. Instead, such instances are routinely assessed using the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Anderson v. KAR Global*, 78 F.4th 1031 (8th Cir. 2023) ("When there is no direct evidence of [ADA] discrimination…the plaintiff may establish an inference of [ADA] discrimination…under the burden-shifting framework provided by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)" (citing *Canning v. Creighton Univ.*, 995 F.3d 603, 614-15 (8th Cir. 2021)); *Olsen v. Cap. Region Med. Ctr.*, 713 F.3d 1149 (8th Cir. 2013) (applying the *McDonnell Douglas* analysis and affirming dismissal of claims by hospital employee terminated due to safety risks posed by seizures); *Bingham v. Union Pac. R.R. Co.*, 693 F.Supp.3d 1033, 1053-54 (D. Neb. 2023); *Clark v. Lyman-Richey Corp.*, No. 8:06CV669, 2008 WL 1733603, at *8 (D. Neb. Apr. 10, 2008) (applying *McDonnell Douglas* when the defendant discharged the epileptic plaintiff "not because of a disability, but because he could not perform the essential functions of his job safely"); *Jackson v. Union Pac. R.R. Co.*, No. 4:19-cv-00069-RGE-RAW, 2021 WL 1726895, at *11 (S.D. Iowa Mar. 29, 2021) (declaring Union Pacific's medical decision about health condition's risk not "direct evidence"), *appeal dismissed* (8th Cir. Nov. 22, 2021); *Higgins v. Union Pac. R.R. Co.*,

931 F.3d 664, 668-70 (8th Cir. 2019) (applying *McDonnell Douglas* analysis to plaintiff's ADA claim arising from medical restrictions issued during a FFD evaluation); *see also Vasquez v. Union Pac. R.R. Co.*, No. 5-22-CV-00478-OLG-RBF, 2024 WL 4312257, at *5 (W.D. Tex. Aug. 26, 2024) (explaining that Union Pacific's FFD process did not constitute "direct evidence" because concluding that the conduct and outcome of that safety-focused process constituted disability discrimination would necessarily require an inference), *report and recommendation adopted by* 2024 WL 4314952 (W.D. Tex. Sept. 23, 2024).[4] While Christensen disagrees with the ultimate judgments of Union Pacific's medical personnel, he can present nothing "directly reflecting [an] alleged discriminatory attitude" by anyone acting on behalf of Union Pacific. *Schierhoff v. GlaxonSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006). As such, his disparate treatment claim must be analyzed utilizing the *McDonnell Douglas* framework.

Under the accepted *McDonnell Douglas* framework, to make out a *prima facie* case of discrimination, Christensen must establish that he (1) was "disabled" as defined by the ADA, (2) was qualified to perform the "essential functions" of his job, with or without reasonable accommodation, (3) suffered an adverse employment action, and (4) there existed a sufficient causal connection between the adverse action and his disability. *Evans*, 996 F.3d at 545 (8th Cir. 2021). "If [the plaintiff] fails to establish any element of his *prima facie* case, summary judgment is proper." *Kellogg*, 233 F.3d at 1086. If, however, a plaintiff does satisfy all required *prima facie* case elements, then the employer must proffer a legitimate, non-discriminatory reason for the challenged adverse employment action. *Evans*, 996 F.3d at 545. Once the employer has done so, the burden shifts back to the plaintiff to show that the proffered reason is pretextual, and that the challenged action was really due to intent to discriminate on the basis of disability. *Id.* A claimant's

---

[4] *Bingham* and *Vasquez* are cases that involve the same Union Pacific medical personnel and FFD program.

failure to establish pretext is itself fatal to his discrimination claim. *Winters v. Deere & Co.*, 63 F.4th 685, 691 (8th Cir. 2023).

**a. Christensen does not have a disability as defined by the ADA.**

An individual is "disabled" under the ADA if the person: (a) has a physical or mental impairment that substantially limits one or more major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment. 42 U.S.C. § 12102(1); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). "Major life activities" include (without limitation) "seeing," "hearing," "eating," "standing," "walking," "speaking," "breathing," "thinking," "communicating," "working," and the "operation of a major bodily function." *Id.* at (2)(A) & (B). Consequently, "not every impairment constitutes a disability[.]" Bingham v. Union Pacific Railroad Co., 693 F.Supp.3d 1033, 1045 (D.Neb., 2023) (citing 29 C.F.R. §1630.2(j)(1)(ii)), appeal filed (8th Cir. Jan. 10, 2024).

A plaintiff may pursue an ADA claim based on an actual disability,[5] a "record of" disability, and/or being "regarded as" having a disability. 42 U.S.C. ¶12102(1)(A)-(C). Failure to establish a "substantial limitation" of at least one "major life activity" is fatal to ADA discrimination claims based on an actual or "record of" disability. *Bingham*, F.Sup.3d at 1046 and 1049 ; see also *Nuzum v. Ozark Auto. Distribs., Inc.*, 320 F. Supp. 2d 852, 860 n.7 (S.D. Iowa 2004) ("[I]f medical records in the case do not establish the existence of an actual disability, neither will they establish the existence of a record of a disability."), aff'd, 432 F.3d 839 (8th Cir. 2005). Christensen cannot show he has an actual disability, a record of a disability, or that Union Pacific regarded him as having a disability.

[5] A plaintiff has a "record of impairment" if he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. §1630.2(k)(1).

i. Christensen does not have an "actual" disability or "record of" a disability.

Christensen has no evidence to prove he has an "actual" disability or "record of" a disability. In fact, Christensen testified that he has never applied for Social Security disability, and did not claim to be disabled. (SOF ¶¶ 33-34). Christensen testified that he believed he was capable of performing his job duties as a Trainman/Conductor in 2016 and that he was stronger in 2016 than he is now not because he was walking over three miles a day and "felt very strong." (SOF ¶ 33).

*Jackson v. Union Pacific Railroad Co*. is instructive here. 2021 WL 1726895, at *11 (S.D. Iowa Mar. 29, 2021). In *Jackson*, the employee was a track laborer who suffered a stroke in April 2017 and was subject to the same five-year restrictions as Christensen. Jackson temporarily suffered from stroke-related deficits, including slurred speech, weakness, and difficulty with oculomotor controls. *Id.* at * 13. However, by July 2017, the deficits resolved, and he claimed he should have no restrictions and be returned to work. The court held that Jackson failed to establish he had an actual disability because these stroke-related deficits resolved, and he was not substantially limited in any major life activities within approximately three months of his stroke. Because Jackson failed to show the deficits were permanent or long-term, they were insufficient to constitute an actual disability. What is more, the court held his continued taking of blood pressure medication was insufficient to establish a substantial limitation in a major life activity. *Id.*

Here, Christensen similarly had temporary deficits from his stroke, including aphasia and right-hand clumsiness, revealed by Christensen's treating physician, Dr. Mohammad Entezari-Taher. (SOF ¶ 13) This is further supported by Christensen's neurologist, Dr. Call, who declared Christensen capable of returning to work in three to four weeks without restriction. (SOF ¶ 20).

While it appears that none of Christensen's doctors evaluated his job description when determining he was capable of returning to work, multiple doctors concluded that Christensen did not have substantial physical limitations within several months following his stroke. (SOF ¶¶ 10, 12-14). Indeed, Christensen cannot prove he was substantially limited in a major life activity. *See Bingham*, F.Sup.3d at 1049 (Finding that in order for the plaintiff to have been limited in his major life activity of working, "it would have required [him] to show a substantial limitation in his 'ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities."), Therefore, like *Jackson*, Christensen cannot establish an actual disability and must proceed, if at all, with a "regarded as" claim under Section 12102(1)(C).

ii. Union Pacific did not "regard" Christensen as having a disability.

To establish Christensen was "regarded as" having a disability by Union Pacific, Christensen must show that Union Pacific subjected him to an adverse action "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Fischer v. Minneapolis Pub. Sch.*, 792 F.3d 985, 988 (8th Cir. 2015) (citing 42 U.S.C. § 12102(1), (3)(A)). The "regarded as" prong addresses "unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities." 29 C.F.R. § Pt. 1630, App.; *Eggering v. MHP, Inc.*, No. 4:10CV01794 AGF, 2012 WL 13055493, at *4 (E.D. Mo. Mar. 13, 2012). "If a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability."[6] *Wisbey v. City of Lincoln, Neb.*, 612 F.3d 667, 672–73 (8th Cir. 2010), *abrogated on other grounds by*

[6] This remains true even after the ADA Amendments Act of 2008 (ADAAA) broadened the scope of the "regarded as" prong. *Watt v. City of Crystal*, No. 14-CV-3167 (JNE/JJK), 2015 WL 7760166, at *5 (D. Minn. Dec. 2, 2015); *Lopez-Lopez v. Robinson Sch.*, 958 F.3d 96, 107 (1st Cir. 2020).

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). see also *Wurzel v. Whirlpool Corp.*, No. 3:09CV498, 2010 WL 1495197, at *5–7, 9–10 (N.D. Ohio Apr. 14, 2010) (holding that employer did not "regard" plaintiff as disabled when it restricted him from operating company vehicles or machinery for safety reasons based on medical guidance about the employee's unpredictable health condition), aff'd, 482 Fed. App'x 1 (6th Cir. 2012).

Christensen's restrictions were based on the recommendation of Union Pacific's Chief Medical Director, Dr. Holland, who evaluated Christensen's risk of suffering from seizure in the future and the residual deficits that Christensen suffered following his stroke, which were deemed to possibly interfere with his ability to perform his job. (SOF ¶¶ 22 and 27-30). Rather than resorting to unfounded myths, Dr. Holland undertook a deliberate process to evaluate Christensen's health and future medical risk. (SOF ¶¶ 15-20 and 22-27). Dr. Holland's decision to issue restrictions for five years—based on medical record information about Christensen's stroke and consistent with the guidance in the Federal Motor Carrier Safety Administration ("FMCSA") Handbook—reflects a bona fide medical judgment based on objective evidence, not the type of unfounded prejudice that the "regarded as" prong is designed to combat.[7]

Such determinations were also perfectly in line with authority drawing a clear and critical distinction between (i) actions taken impermissibly based on a belief that an employee currently has a physical impairment versus (ii) those taken permissibly based on safety concerns related to an employee's potential future health risks. See *Morriss v. Burlington N. Santa Fe Ry. Co.*, 817 F.3d 1104, 1113 (8th Cir. 2016) (holding that railroad did not regard an applicant as disabled based on any existing impairment when it denied him for a safety-sensitive position, but instead permissibly based the denial on concerns about the applicant's potential future health risks);

---

[7] Even were Christensen able to show he was "regarded as" having a disability, that "does not, by itself, establish liability." 29 C.F.R. § 1630.2(1)(3).

*Jackson*, 2021 WL 1726895, at *14 ("Union Pacific's decision to issue work restrictions and a five-year waiting period do not indicate Union Pacific believed [plaintiff, who suffered a stroke] had a physical impairment….It shows Union Pacific believed [plaintiff] was at risk of becoming physically impaired and creating a safety hazard [in the future] while performing his job."); *Bingham*, F.Sup.3d at 1052 ("Union Pacific's belief that [plaintiff, a stroke victim] was at risk of becoming physically impaired and creating a safety hazard while performing his job duties does not mean that Union Pacific believed [plaintiff] had a physical impairment."). Union Pacific's actions here were clearly focused on and consistent with reasonably mitigating future safety risks, which place them firmly in the "permissible" category.

Union Pacific also indicated that it would be willing to re-evaluate Christensen's medical restrictions after five years. (SOF ¶ 28). This, too, undermines his ability to sustain a "regarded as" discrimination claim. *Fischer*, 792 F.3d at 989-90; Jackson, 2021 WL 1726895, at *14. Union Pacific did not make its decision based upon "unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities." Union Pacific relied on Dr. Holland's medical judgment based upon a federal standard and medical literature that Christensen needed functional work restrictions for five years. (SOF ¶¶ 15-20 and 27-31). Union Pacific's reliance on Dr. Holland's medical judgment, grounded in safety, not unfounded stereotype or prejudice, is not "regarding" Christensen as having a disability under the ADA. Further negating the claim is the fact that Christensen can provide no evidence that Union Pacific believed he was disabled when it issued the medical restrictions to him.

Taking all of this together, there is simply no basis on which a reasonable jury could find that Christensen establishes a "disability" of any kind protected by the ADA.

**b. Christensen Was Unable to Perform the "Essential Functions" of His Job at the Time of the Adverse Action He Challenges.**

To survive summary judgment, Christensen must also show that he was qualified to perform the "essential functions" of his position at the time of the adverse action about which he complains. *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019); *Otto v. City of Victoria*, 685 F.3d 755, 758 (8th Cir. 2012); *see also* 29 C.F.R. §1630.2(m). "Essential functions are 'the fundamental job duties of the employment position.'" *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 923 (8th Cir. 2018) (quoting *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 787 (8th Cir. 1998)); *see also* 29 C.F.R. §1630.2(n). Since employers need not provide accommodations when the employee is merely "regarded as" disabled (which is the most Christensen can contend here), the inquiry under this step does not consider the effect of any possible accommodations. *Hanson v. N. Pines Mental Health Ctr., Inc.*, No. CV 16-2932 (DWF/LIB), 2018 WL 1440333, at *8 (D. Minn. Mar. 22, 2018) (citing 42 U.S.C. §12201(h)).

Christensen is not qualified based on two mutually reinforcing pillars of the ADA. First, employers are "entitled to rely on [medical] recommendations that [an employee] was not able to safely perform an essential function of [the] job." *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 969 (7th Cir. 2020). Indeed, it would "defy common sense to demand that [employers] disregard [] well-documented medical opinions and allow [their] employees…to prematurely return to work, thereby jeopardizing their safety." What is more, "[a]n individual may not be a qualified individual if he poses a direct threat to the health or safety of himself or others." *Jackson*, 2021 WL 1726895, at * 15 (citing *Burroughs v. City of Springfield*, 163 F.3d 505, 508 (8th Cir. 1998)). *Id.* Second, "whether a plaintiff is qualified is measured at the time of the adverse employment action, even if the plaintiff is likely to recover in a relatively short period of time."

*Duello v. Buchanan Cnty. Bd. of Supervisors*, 628 F.3d 968, 972 (8th Cir. 2010); *see also Browning v. Liberty Mut. Ins.*, 178 F.3d 1043, 1048 (8th Cir. 1999).

Here, the undisputed medical evidence shows Christensen had a type of stroke that creates an enhanced risk of future seizures and potential of suffering a future stroke. (SOF ¶¶ 8, 9, 10, 11, 12, 15-21, and 27-31). The FMCSA's guidance on strokes—on which Union Pacific reasonably relied in creating its own medical standards that guided Christensen's FFD evaluation—recommended a corresponding five-year waiting period before Christensen could return to his prior safety sensitive position. (SOF ¶¶ 15-20) *See* Exhibit F, p. 51 ("As a medical examiner, you must disqualify a driver who: . . . [y]ou believe has a medical condition that endangers the health and safety of the driver and the public.); *See also* Exhibit C, p. 6, ("Union Pacific's cautious placement of work restrictions on Mr. Christensen, is consistent with the applicable scientific literature and its own threshold of 1% risk for a potential sudden incapacitating event.").. Union Pacific could not simply disregard the medical evidence or the medical guidance of the FMCSA and knowingly expose itself to the very safety-related risk the Handbook aims to prevent. *Accord Rizzo v. Children's World Learning Ctrs., Inc.*, 173 F.3d 254, 268 (5th Cir. 1999) ("There is no evidence that Congress intended to place an employer in such a Catch-22 situation—either discriminate or endanger your business and the safety of others").

Moreover, Christensen's own treating physician, Dr. Call, has testified that Christensen is at an increased risk of suffering a future stroke as a result of his first stroke and should refrain from returning to work for three to four weeks. (SOF ¶ 10). Additionally, another treating physician, Dr. Taher, described Mr. Christensen as having mild expressive aphasia and mild clumsiness in his right hand over a year following Mr. Christensen's stroke. (SOF ¶ 13). Thus, as of March 2016, when Dr. Holland issued Christensen's medical restriction, doctors on both sides of the case agreed

Mr. Christensen had residual deficits from his stroke and that he was more likely to suffer a stroke in the future than the general public. While Christensen nonetheless tries to dispute the necessity of the medical restrictions, he fails to provide any expert testimony or factual evidence to support his ability to safely perform the essential functions of his job as a Trainman/Conductor.

Safety is irrefutably a key function of Christensen's job. (SOF ¶¶ 1-7). His risk of losing consciousness made him unable to perform the essential functions of his job. *Jackson*, 2021 WL 1726895, at * 15 (a track laborer who had similar job functions including, for example, "practicing safe work habits" and "taking appropriate action when conditions threaten the safety of self and co-workers" was not qualified due to his risk of future seizures in the five years following his stroke).

On this record, Christensen simply cannot establish that he was capable of performing the essential functions of his safety-sensitive position at the time he sought to return to work shortly after his stroke. This failure alone dooms any ADA disparate treatment claim. *See Duello*, 628 F.3d at 971-74 (affirming dismissal of ADA discriminatory termination claim due to truck operator's inability to perform the essential functions of his job following a seizure, where even the plaintiff's own physician agreed he could not return to work until he had been seizure-free for at least six months).

**c. Christensen Cannot Prove that his Medical Restrictions were Caused by Intentional Discrimination.**

An ADA claimant must also establish "but for" causation. *Canning v. Creighton Univ.*, 995 F.3d 603, 610 (8th Cir. 2021). This requires a plaintiff to show that the employer's adverse action was due to an intent to discriminate on the basis of the plaintiff's disability. *Lipp*, 911 F.3d at 544.

As an important causal limitation on the potential scope of ADA claims, the Eighth Circuit has clarified that taking adverse action against an employee "because of the job performance consequences of a disability…rather than the disability itself, is not actionable under the ADA." *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1219 n.3 (8th Cir. 1999); *see also Power v. Univ. of N.D. Sch. of Law*, 954 F.3d 1047, 1054–55 (8th Cir. 2020) (explaining that a decision based on "factors [that] may have been affected by [plaintiff's] disability" does not signify "evidence of a discriminatory animus against [him] based on his disability"); *accord Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1198 (7th Cir. 1997) ("The employer who fires a worker because the worker is diabetic violates the [ADA]; but if he fires him because he is unable to do his job, there is no violation, even though the diabetes is the cause of the worker's inability to do his job."); *Anderson v. Norfolk S. Ry. Co.*, No. 3:18-cv-00190, 2021 WL 1214622, at *8 (W.D. Pa. Mar. 31, 2021) (explaining that the "ADA prohibits discrimination based on stereotypes (i.e., adverse action simply on the basis of the person's disabling, or perceived disabling condition)," but it does not "bar acting when that condition leads to harm or risk of harm"), *aff'd*, 2022 WL 1073581 (3d Cir. Apr. 11, 2022).

The "but for" causation requirement is critical to Christensen's claim because "disability discrimination is not concerned with judging whether a medical professional's recommended work restrictions…are right or wrong from a strictly medical standpoint," but "whether there is any evidence of discrimination by the medical professionals in formulating those restrictions." *Goff*, 2020 WL 1794967, at *12. That is why the "ADA is designed to ferret out those situations in which an employer is deliberately acting in a discriminatory manner, and those in which an employer is merely attempting to create a safe work environment." *Beckner v. Tread Corp.*, No. 7:13CV00530, 2014 WL 6902328, at *10 (W.D. Va. Dec. 8, 2014); *see also Jackson*, 2021 WL

1726895, at *16 (finding that Union Pacific did not issue restrictions "because of" the plaintiff's hemorrhage, but because of legitimate safety concerns based on its doctors' "reasonable medical judgments"). "By requiring that plaintiffs prove that…they suffered [actual] discrimination, the ADA framework helps courts to discern which employment decisions are based on illicit motives and which are premised on maintaining the safety of the work force…." *Webb v. Med. Facilities of Am.*, No. 7:05CV00409, 2005 WL 3547034, at *3 (W.D. Va. Dec. 28, 2005).

The evidence here uniformly establishes that Union Pacific did not place medical restrictions on Christensen because it considered him to be disabled. Instead, Union Pacific issued the restrictions because Christensen's health circumstances posed a substantial risk of future sudden incapacitation, which in turn posed safety risks to himself and others due to the safety-sensitive nature of his Trainman/Conductor job. (SOF ¶¶1-7, 15-22, and 27-32). As such, Christensen simply cannot demonstrate the existence of any intentional discrimination on the part of Union Pacific, let alone a "but for" causal connection between intentional discrimination and his medical restrictions.

**d. Christensen Cannot Prove that Union Pacific's Legitimate Workplace Safety Reasons for Issuing Medical Restrictions to Christensen were Pretext for Intentional Discrimination.**

Even if Christensen were somehow able to establish all elements of his *prima facie* case, he would still have to prove that Union Pacific's rationale for issuing medical restrictions to him after his stroke was really pretextual and, in fact, rooted in discriminatory intent. Christensen has failed to provide any such evidence.

Union Pacific's legitimate, nondiscriminatory reason for issuing medical restrictions to Christensen was the safety risk posed by Christensen's increased risk of sudden incapacitation due to a recurrent stroke while working on or near trains and/or otherwise operating trains or

locomotives. (SOF ¶¶ 1-7, 15-22, and 27-32). Workplace safety is a legitimate, nondiscriminatory reason justifying an adverse employment action. *Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 778 (8th Cir. 2001); *see also Owen v. Union Pac. R.R. Co.,* No. 8:19CV462, 2020 WL 6684504, at *7 (D. Neb. Nov. 12, 2020) ("Union Pacific stated a legitimate, nondiscriminatory reason for removing [plaintiff] from service—his safety…."). Union Pacific's articulation of that non-discriminatory reason shifts the burden back to Christensen to prove that Union Pacific's explanation was pretextual. *Winters*, 63 F.4th at 690.

To show pretext, Christensen must offer evidence "to demonstrate both that [Union Pacific's] articulated reason for the adverse employment action was false and that discrimination was the real reason." *Id.* A proffered legitimate reason "need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the [adverse action]." *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008); *see also Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015). A plaintiff must "present sufficient evidence that [the employer defendant] acted with an intent to discriminate, not merely that the reason stated by the [employer] was incorrect." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012). As such, a plaintiff cannot show pretext merely by challenging his employer's underlying medical opinions or conclusions. *See, e.g., White v. Union Pac. R.R. Co.,* No. 4:19-cv-00080-DGK, 2022 WL 1315089, at *10 (W.D. Mo. Jan. 11, 2022) (finding Union Pacific's belief that the plaintiff's health ailments prevented him from safely performing his job was "honestly held," and differences in medical opinion showed "at best" that a different conclusion was possible); *Krehbiel v. Union Pac. R.R. Co.*, No. 19-2002-JAR, 2020 WL 5503363, at *11 (D. Kan. Sept. 11, 2020) (finding Union Pacific "simply relied on [its own] doctors' medical judgments and restrictions in making the determination that Plaintiff could not safely perform the essential

functions of his job," which was not pretext); *Spencer-Martin v. Exxon Mobile Corp.*, No. 16-789-SDD-RLB, 2018 WL 3015759, at *18 (M.D. La. June 15, 2018) (reasoning in a medical decision case that "[a]n employer can make an incorrect employment decision; if based on a good faith belief with no discriminatory influences, then the court will not try the validity of the reason"); *Zulueta v. U.S.*, No. 3:08-CV-246, 2009 WL 1651172, at *9 (M.D. Tenn. June 10, 2009) ("[T]he question is thus not whether [the employer's decision] was correct measured by 'objective' standards. What is relevant is that [the employer], in fact, acted on its **good faith belief about plaintiff's condition based upon the medical professional's opinion.**" (emphasis in original)); *Crocker v. Runyon*, 207 F.3d 314, 319 (6th Cir. 2000) ("Even if the earlier medical opinions [of two private physicians] were demonstrably flawed, the [employer's] reasonable reliance upon them is not discriminatory.").

Evidence of pretext may include instances where an employer failed to follow its own policies, treated similarly-situated employees more favorably, or shifted its explanation for the adverse employment decision. *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014).

Christensen can make no showing even remotely suggesting that Union Pacific issued medical restrictions to him as a pretext for intentional disability discrimination. Union Pacific's medical personnel consistently followed the company's internal medical safety policies, which in turn were based on objective medical guidance issued by a federal governmental agency. (SOF ¶¶ 15-22, and 27-32). (*Infra*, Section III.D). Everything about the FFD evaluation process confirms that go-forward workplace safety was the operative consideration. (SOF ¶¶ 22-32). Christensen can produce no evidence calling Union Pacific's good-faith focus on workplace safety during his FFD evaluation into question—indeed, Christensen concedes that Union Pacific prioritizes safety and that he had a duty in his position to his fellow employees regarding safety. (SOF ¶¶ 6-7). Even

if Christensen could somehow call Union Pacific's good faith decision-making into question, he still has absolutely no evidence suggesting that the company was really motivated by a desire to discriminate against him based on disability. In fact, Christensen does not contend that he is disabled, never applied for disability benefits, and has no evidence that Union Pacific ever thought he had a disability. (SOF ¶¶ 33-34). In short, any contention of discriminatory pretext here is frivolous.

A failure to show pretext independently dooms a disparate treatment claim. *Bingham*, F.Sup.3d at 1056 ( Finding that "[Plaintiff's] failure to demonstrate pretext serves as an alternative basis to grant summary judgment in Union Pacific's favor" as to plaintiff's disparate treatment claim).Consequently, Christensen's claim under Section 12112(a) may be dismissed for this reason alone.

**2. Christensen's Section 12112(b)(6) Claim Fails as a Matter of Law.**

Christensen's claim under Section 12112(b)(6) of the ADA should be dismissed as a matter of law for either of two reasons. First, it was improperly pled as a disparate treatment claim, and Christensen, therefore, failed to assert a cognizable claim. Second, even if the Court permits a disparate treatment claim under Section 12112(b)(6), Christensen has failed to establish the necessary elements of this claim.

**a. Christensen Improperly Plead His Section 12112(b)(6) Claim as a Disparate Treatment Claim**

Christensen improperly pleads his claim under Section 12112(b)(6) as "disparate treatment" claim. (ECF 1 at Count II). An employee's challenge to "qualification standards" under Section 12112(b)(6) is properly analyzed as a "disparate impact" claim because it depends on the *effect* of the qualification standard and whether it "screens out individuals with disabilities," not the *intent* for which the standard was adopted.

Case law from the Eighth Circuit and elsewhere supports the view that challenges to alleged "qualification standards" under Section 12112(b)(6) are disparate impact claims, not disparate treatment claims. In *Boersig v. Union Elec. Co.*, 219 F.3d 816, 822 (8th Cir. 2000), the Eighth Circuit discussed a Section 12112(b)(6) claim as "invoking a disparate-impact theory of ADA liability." The Second Circuit has distinguished "cases alleging discriminatory application of qualification standards" from "cases in which a plaintiff alleges 'disparate treatment.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006). The Seventh Circuit, likewise, has reasoned that a plaintiff who does not want to bear the burden of proving he was a victim of intentional discrimination may "switch to the disparate-impact approach" and identified Section 12112(b)(6) as the relevant provision of the ADA under which to pursue such a claim. *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1196 (7th Cir. 1997). In *Fulbright v. Union Pac. R.R. Co.*, No. 3:20-CV-2392-BK, 2022 WL 625082, at *3 (N.D. Tex. Mar. 2, 2022), the court concluded that "analyzing Plaintiff's [Section 12112(b)(6)] claim under a disparate-treatment theory would be nonsensical." Put simply, "[c]laims brought pursuant to §12112(b)(6) [should be] treated as disparate impact claims." *Allmond v. Akal Sec., Inc.*, No. 4:05-cv-96(HL), 2007 WL 29004023, at *6 (M.D. Ga. Sept. 28, 2007), *aff'd*, 558 F.3d 1312 (11th Cir. 2009) (collecting cases). Because Christensen did not properly plead his Section 12112(b)(6) claim under a disparate treatment theory, the claim should be dismissed.

**b. If Christensen's disparate treatment claim is permitted, the claim still fails as a matter of law**

If this Court permits Christensen to pursue a disparate treatment theory under Section 12112(b)(6), he must prove discriminatory intent. *See Raytheon*, 540 U.S. at 53. Put simply, "[d]isparate impact discrimination does not require proof of discriminatory motive; disparate treatment does." *Royal v. Missouri Highway & Transp. Comm'n*, 655 F.2d 159, 163 (8th Cir.

1981). At a minimum, Christensen must demonstrate that Union Pacific used a "qualification standard" that was either "facially discriminatory" or was used to intentionally screen out individuals with a disability. *Carlton v. Union Pac. R.R. Co.*, No. 8:23-CV-0211, 2023 WL 6388021, at *14–15 (D. Neb. Sept. 29, 2023).

To the extent Christensen is claiming that Union Pacific's FFD workplace safety policies and processes constitute the requisite "qualification standard," a disparate treatment claim based thereon necessarily fails. The policies are not "facially discriminatory," as they do not expressly consider or target any recognized disability but instead focus on an assessment of potential future safety risks posed by certain employees' vulnerability to sudden incapacitation. *See Carlton*, 2023 WL 6388021, at *12. As noted above, employees with certain disabilities may well be deemed not to pose unacceptable risks of sudden incapacitation, such as to warrant medical restrictions, while other employees without disabilities may nonetheless be restricted due to such sudden incapacitation risk. In other words, the FFD process "lead[s] to varying—and individualized—outcomes for individuals with and without disabilities," meaning it cannot be said to be facially discriminatory. *Id.* at *14.

Further, Christensen cannot point to any facts suggesting that the FFD process was applied to him with discriminatory animus. Indeed, this Court has consistently found that Union Pacific's FFD process is intended to achieve workplace safety, not any inherently discriminatory ends as would be required to violate Section 12112(b)(6). *See, e.g., Baker v. Union Pac. R.R. Co.*, No. 8:20CV315, 2023 WL 3696678, at *5 (D. Neb. May 16, 2023); *Brundy v. Union Pac. R.R. Co.*, No. 8:23-CV-238, 2023 WL 6621112, at *16 (D. Neb. Oct. 11, 2023); *Davis v. Union Pac. R.R. Co.*, No. 8:23-CV-237, 2023 WL 6803909, at *12 (D. Neb. Oct. 11, 2023); *Hower v. Union Pac. R.R. Co.*, No. 8:23-CV-206, 2023 WL 6804026, at *12 (D. Neb. Oct. 11, 2023); *Meza v. Union*

*Pac. R.R. Co.*, 2022 WL 4131359, at *4 (D. Neb. Sept. 12, 2022). Therefore, even if analyzed through the lens of disparate treatment, Christensen's Section 12112(b)(6) claim fails as a matter of law and should be dismissed.

**d. Even if Christensen could show Union Pacific imposed a qualification standard that screens our persons with disabilities, any such qualification standard is job related to his position and consistent with business necessity.**

Employers may rely on a qualification standard that screens out or tends to screen out disabled individuals so long as it is "job-related and consistent with a business necessity." *Albertson's*, 527 U.S. at 568 (citing 42 U.S.C. § 12113(a)). Christensen has not identified *what* he alleges is unlawful, or *how* he fell victim to any specific screening criteria, so Union Pacific does not know what particular aspect of its FFD policy it must justify. Still, a business necessity is undoubtedly supported by the FFD result here, given the safety specific nature of Christensen's position as a Trainman/Conductor and the significant risk of danger that a sudden event of lost consciousness would pose to himself or others. (SOF ¶¶ 1-7, 15-22, and 27-32.) *See Parker v. Carrier Corp.*, 158 F. Supp. 3d 813, 822 (D. Neb.), *aff'd sub nom.* 839 F.3d 717 (8th Cir. 2016) (explaining that "business necessity" includes public and workplace safety). Therefore, even if Christensen could establish Union Pacific imposed a qualification standard that screened out persons with disabilities, Union Pacific has established that acting on the results of Christensen's FFD was job-related and consistent with business necessity.

**B. <u>Union Pacific's "Direct Threat" Defense Completely Negates Christensen's ADA Claims</u>**

Even if Christensen could somehow overcome all of the above-noted, fatal legal and factual deficiencies in his ADA claims, they would remain subject to dismissal based on Union Pacific's "direct threat" defense, which is conclusively established based on the undisputed material facts of record.

An employer is entitled to summary judgment if the employee posed a "direct threat" to himself or others. *Equal Emp. Opportunity Comm'n v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) (citing 42 U.S.C. §12113(b)); *see also* 42 U.S.C. §12111(3). To establish its direct threat defense, Union Pacific must show it made (1) an individualized assessment and (2) a reasonable medical judgment relying on current medical knowledge or the best available objective evidence. 29 C.F.R. §1630.2(r). Union Pacific clearly satisfies both factors.

**1. Union Pacific's Assessment of Christensen was individualized**

An employer may show an individualized assessment if it "relied on doctors' evaluations and facts contained in medical documentation." *Jackson*, 2021 WL 1726895, at *19. An individualized assessment does not require an independent medical examination or even that the company doctor examine the employee directly. *Coleman v. Pennsylvania State Police*, 561 Fed. App'x 138, 145 (3d Cir. 2014); *see also Carillo v. Union Pacific R.R. Co.*, No. 22-50782, 2024 WL 3861374, at *5 (5th Cir. Aug. 19, 2024) ("The fact that Union Pacific's doctors did not personally meet with [plaintiff employee] also does not undermine their conclusions; these doctors relied on extensive medical reports submitted by the doctors who did. Moreover, the direct threat defense does not require a company to mine all sources of evidence."); *Id.* at *4 n.2 (noting that direct threat "precedents [do not] require that an employer have its own doctors meet with or examine an employee before taking appropriate action"). In *Bingham*, for example, the FFD evaluation that Union Pacific conducted was sufficiently individualized because the company's Associate Medical Director relied on documented medical evidence specific to the employee claimant. F.Sup.3d at 1057-1058. What is most essential is that the employer considers the particular employee's circumstances in some meaningful manner rather than relying on mere stereotypical, generalized assumptions. *Wal-Mart*, 477 F.3d at 571.

Union Pacific's FFD evaluation of Christensen was appropriately individualized. The Medical Comments History created by Union Pacific's Health and Medical Services ("HMS") details how uniquely tailored the process was to Christensen. (*See* Exhibit H)). It describes each step in the review, showing the many touchpoints between Christensen and Union Pacific's HMS staff. It also confirms Dr. Holland's review and analysis of the personal medical records submitted by Christensen in reaching his ultimate medical judgments. Dr. Holland additionally drafted a five-page memorandum summarizing Christensen's stroke and the associated risks related to his employment. (*See* Exhibit G). Nothing about the process suggests that Dr. Holland based those medical judgments on abstract stereotypes instead of information related specifically to Christensen, his health circumstances, and the future safety risks posed by those circumstances in light of the specifics of his safety sensitive job as a Trainman/Conductor.

**2. Union Pacific's Decision was Objectively Reasonable**

An employer's direct threat determination should be "appropriately based on objective evidence and reasonable medical judgment." *Burroughs v. City of Springfield*, 163 F.3d 505, 508 (8th Cir. 1998). An employer need not show its direct threat decision was "correct," only that it relied "on an 'objectively reasonable' opinion." *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015). Proof of an "actual threat" is "unnecessary," as an employer avoids liability if it "reasonably believed the job would entail a direct threat." *E.E.O.C. v. Beverage Distributors Co.*, 780 F.3d 1018, 1021 (10th Cir. 2015). Indeed, the fact-finder "does not independently assess whether it believes that the employee posed a direct threat" because its "role is to determine whether the employer's decision was objectively reasonable." *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007).

Other courts applying this standard have confirmed that it is objectively reasonable for Union Pacific's staff of experienced occupational medicine physicians to issue medical decisions relying on FMCSA guidance.

In *Bingham*, a Union Pacific associate medical director's reliance on FMCSA guidelines was "within his reasonable medical judgment," and "no reasonable jury could find that Union Pacific's reliance on guidelines that were patterned on those applicable to commercial drivers—a comparable commercial transport business—was anything less than objectively reasonable." *Bingham,* F.Sup.3d at 1059.

In *Jackson*, the court held that "no reasonable jury could find Union Pacific's direct threat determination was not objectively reasonable" when it relied on its doctors' evaluations, the plaintiff's medical records, and the FMCSA's recommended restrictive period for brain hemorrhages. 2021 WL 1726895, at *19–20.

In *Carter*, the plaintiff's five-year restrictions following a motorcycle wreck were objectively reasonable when Union Pacific "considered plaintiff's intracerebral hemorrhage, its location, and the risk that this injury posed for sudden incapacitation in the future." *Id*. at *15. And "[r]elying on guidance from the FMCSA, [Union Pacific's doctors] concluded that plaintiff's head injury presented a risk of seizure or sudden incapacitation for the five years following his injury." *Id*. at *15. *See also Krehbiel v. Union Pac. R.R. Co*., 2020 WL 5503363, at *9–11 (D. Kan. Sept. 20, 2020); *Witchet v. Union Pac. R.R. Co*., 2020 WL 12762513, at *9 (D. Neb. Feb. 21, 2020).[8]

Union Pacific's decision here was objectively reasonable, too. Union Pacific has what the Eighth Circuit required in *Burroughs*. First, it relied on "objective medical evidence." Dr. Holland

---

[8] *Witchet* involved application of the FMCSA Handbook to a commercial driver. But because the Handbook informs medical risk, it is still a roadmap for objective medical assessments of employees in other safety-sensitive jobs. The NTSB has recognized that the medical risk is the same across industries. (SOF 69).

acted entirely appropriately here. Dr. Holland is an occupational medical doctor with many years of experience evaluating the fitness of railroad workers. He considered substantial medical record information regarding Christensen for the pertinent timeframe, including the results of CT scans, follow-up care records, and new medical evaluations occurring in 2016. (SOF ¶¶ 22, 27-28). He applied his own understanding of Christensen's impaired conditioning and the risks of future sudden incapacitation that it posed based on his decades of experience as an occupational physician, his understanding of the rigors of Trackman/Conductor jobs at Union Pacific, and his knowledge of and duty to enforce the company's mitigation threshold for future sudden incapacitation safety risks. Dr. Holland based his decision to issue work restrictions on the FMCSA Handbook, the medical records provided by Plaintiff, and his concern that there was an unacceptable high risk of future seizures, testifying that "I mean the fact that he'd had the stroke, the fact that he had atrial fibrillation, which was a cause of the stroke, and then the findings that he had some low ejection fraction, which suggested mild heart failure and possible cardiomyopathy. So all of these things were of concern.." (*See* Exhibit M, at 25:24:26:3, 27:13-28:15, 35:9-36:23). The ADA simply does not require more than that. *Accord Carillo,* 2024 WL 3861374, at *3 (holding that Union Pacific's HMS doctors demonstrated reasonable judgment that relied on appropriately objective medical evidence where, *inter alia*, they had the plaintiff employee examined by outside doctors (including a cardiologist), had him undergo relevant medical testing (including a stress test and EKG), and consulted with an outside specialist at the University of Nebraska Medical Center before issuing medical restrictions). As is the case here, Dr. Holland reasonably relied on the medical literature used in the FMCSA Handbook recommending a minimum waiting period of five years for an employee, such as Christensen, who suffered from a stroke with a risk for seizures. *(See* Exhibit F, p. 160-164).

Moreover, accurately forecasting or quantifying Christensen's seizure risk is nearly impossible. Given the complexity of forecasting the potential risk of seizures or future strokes, Union Pacific's reliance on the FMCSA Handbook to assess difficult questions of future risk was all the more reasonable. The "views of an agency such as DOT implementing a regulatory scheme designed to ensure the safety of our nation's highways constitute a body of experience and informed judgment to which employers may properly resort for guidance." *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 994 (10th Cir. 2001) (quotation omitted). The FMCSA Handbook is among the "best available objective evidence" to evaluate that risk even when applied outside the trucking industry. *Pontinen v. United States Steel Corp.*, 26 F.4th 401, 406 (7th Cir. 2022). In *Pontinen*, a steel plant relied on its in-house physician's application of the Handbook to an employee with epilepsy, and giving more weight to one particular source like the Handbook was within the physician's "reasonable medical judgment." *Id*.

Relying on FMCSA medical guidance to safeguard railways is no less valid than highways given that it informs critical decisions about an employee's "medical condition that endangers the health and safety of the driver and the public." (*See* Exhibit F, p. 48).The FMCSA's Medical Review Board found that "[s]eizures are another topic for which there are quality data to indicate a 13% to 116% increased risk of crash. . ." *See* Exhibit N, p. 427. As described in *Carter*, Union Pacific's "medical standards relied on evidence-based guidance that medical advisors and experts had developed and updated," and "the NTSB recognized those standards as ones relevant to railroad workers in safety-critical positions." *Carter*, 2022 WL 1909049, at *21.

While Christensen appears to disagree with the ultimate correctness of Dr. Holland's medical risk management judgment, as explained above, that is not the appropriate inquiry under the governing law, as a federal court of appeals very recently reiterated. *See Carillo*, 2024 WL

3861374, at *3 ("The direct threat defense protects the employer even if the employer does not reach the correct diagnosis."). At best, Christensen offers no rebuttal other than releases from his treating physician to return to work—not that Dr. Holland failed to exercise reasonable medical judgment here. *See id.* at *5 ("[T]he direct threat analysis asks whether the employer made a 'reasonable medical judgment,' not whether every examining doctor came to the same exactly conclusion." (internal citation omitted)). No reasonable jury could conclude on this record that Dr. Holland failed to gather and consider reasonable and objective medical information for purposes of his FFD decision-making

**3. The § 1630.2(r) Factors Support Union Pacific's Direct Threat Defense.**

The legitimacy of Dr. Holland's decision-making is also supported—individually and collectively—by factors that courts often consider in making "direct threat" determinations: (1) the duration of the risk; (2) the nature and severity of the harm; (3) the likelihood that the harm will occur; and (4) the imminence of the harm. 29 C.F.R. §1630.2(r).

As for the duration of the risk, the 2014 FMCSA Handbook, on which Union Pacific's medical standards are based, advises that a stroke is linked to an unacceptable risk of seizures for five years. (SOF ¶¶ 15-20). Dr. Fayad, a UNMC Department of Neurological Sciences Professor, states that Christensen's severely dilated left atrium and mildly decreased left ventricular function places him at a higher risk for recurrent atrial fibrillation. (*See* Exhibit C, p. 5) Dr. Fayad similarly concludes that relevant medical literature shows "the risk of seizures after stroke is significantly elevated after an ischemic stroke, and approaches about 5% within the first 5 years after stroke. (*See Id.*).

The Potential harm of a seizure for a Trainman/Conductor is catastrophic. Christensen's position required him to operate and control trains or locomotives. (*See* Exhibit B). Christensen

agreed that mistakes made in his position could result in serious damage, injury, or death. (SOF ¶ 5). Even where the likelihood of an acute incapacitation event may be small, if the risk of harm is severe it should be treated as significant. *Anderson v. Norfolk S. Ry. Co.*, 2022 WL 1073581, at * 2–3 (3d Cir. 2022). Moreover, like in *Bingham*, Dr. Holland did not prohibit Christensen from working in *any* capacity, but instead assigned restrictions that were ultimately incompatible with the safety-sensitive nature of the ballast regulator operator job. *Bingham*, F.Sup.3d at 1061.

Regarding the likelihood and imminence of the potential harm, Dr. Holland determined that Christensen posed an immediate, imminent, and significant risk of sudden incapacitation that could seriously endanger both himself and his co-workers if he continued in the Trainman/Conductor role. (SOF ¶¶ 27-32.) At the very least, those circumstances and considerations made it reasonable for Dr. Holland—acting to prevent worker injury and properly mitigate liability risk to Union Pacific—to conclude the restrictions were necessary unless or until Christensen's medical condition and increased risk of sudden incapacitation was removed entirely.

As noted above, the ADA "requires only that the employer rely on an 'objectively reasonable' opinion, rather than an opinion that is correct." *Michael*, 808 F.3d at 309. The Court's role is to ensure the "decision-maker has reasonably considered and relied upon sufficient evidence specific to the individual and the potential injury, not to determine on its own which evidence it believes is more persuasive." *Knapp*, 101 F.3d at 484. That decision is instead best left to the entity's doctor so long as it is made "with reason and rationality" and "objective evidence" rather than unfounded stereotypes. *Id*. at 484, 486. This bedrock principle of the ADA withstands a retained expert trumpeting a contrarian view long after-the-fact. *See Jackson*, 2021 WL 1726895, at *20 (confirming that a "plaintiff does not generate a factual issue as to the objective reasonableness of the employer's direct threat determination merely by supplying its doctor's

contrary opinions"). The alternative would force entities to gamble with the lives they are entrusted to protect in case a retained expert disputes their decision years later. *See Anderson*, 2022 WL 1073581, at * 2-3 (holding that plaintiff could not prevail by "nitpicking" medical officer's decision that a heart condition presented an unacceptable risk despite a release from plaintiff's cardiologist); *Pahulu v. Univ. of Kansas*, 897 F. Supp. 1387, 1394 (D. Kan. 1995) (explaining that the physician's decision was reasonable and the "court is unwilling to substitute its judgment" despite three specialists finding plaintiff was not at risk). Indeed, the law affords Union Pacific the latitude to determine for itself how much safety-related risk it is willing to accept. *Bingham*, 693 F. Supp. 3d at 1062 ("Union Pacific was entitled to weigh how much risk it was willing to accept, particularly given the safety-sensitive nature of the track inspector position and the potential for catastrophic consequences if [plaintiff] were to become suddenly incapacitated while working on or near the tracks."); *EEOC v. Schneider Nat., Inc.*, 481 F.3d 507, 510 (7th Cir. 2007) (confirming that an employer has a right "to determine how much risk is too great for *it* to be willing to take" (emphasis in original)). Dr. Holland had to make a real-time assessment where forecasting the future is nearly impossible, and miscalculating the risk carries the potential for mortally serious consequences. Dr. Holland's decision was firmly rooted in medical science and a review of Christensen's medical testing and evaluations that objectively showed the significant risk of future sudden incapacitation risk that could prove incredibly dangerous in his safety-sensitive position—in other words, "objective evidence," which alone is enough. *Knapp*, 101 F.3d at 486.

Numerous courts applying the above-noted standards to Union Pacific FFD evaluations have concluded that it is objectively reasonable for Union Pacific's staff of experienced occupational medicine physicians to make health and safety-related decisions regarding medical restrictions for company employees in safety-sensitive positions. For example:

- In *Bingham*, a Union Pacific Associate Medical Director's reliance on employee medical records and long-used medical guidelines was "within his reasonable medical judgment," and "no reasonable jury could find that Union Pacific's reliance on [them]…was anything less than objectively reasonable." 693 F.Supp.3d at 1059.
- In *Jackson*, the court held that "no reasonable jury could find Union Pacific's direct threat determination was not objectively reasonable" when it relied on its doctors' evaluations, the plaintiff's medical records, and widely-used industrial medical guidance. 2021 WL 1726895, at *19-20.
- In *Carter*, the plaintiff's five-year restrictions following a motorcycle wreck were objectively reasonable when Union Pacific "considered the plaintiff's intracerebral hemorrhage, its location, and the risk that this injury posed for sudden incapacitation in the future." 2022 WL 1909049, at *15.
- *See also Krehbiel*, 2020 WL 5503363, at *9-11; *Witchet v. Union Pac. R.R. Co.*, No. 8:18CV187, 2020 WL 12762513, at *9 (D. Neb. Feb. 21, 2020).

The same outcome—namely, dismissal of Christensen's ADA claims due to Union Pacific's "direct threat" defense—is equally warranted here.

**C. <u>Christensen's ADA Claims do not Support an Award of Punitive Damages.</u>**

Union Pacific is also entitled to summary judgment on Christensen's claim for punitive damages. "Plaintiffs who seek punitive damages in employment discrimination cases face a formidable burden." *Webner v. Titan Dist. Inc.*, 267 F.3d 828, 837 (8th Cir. 2001). Indeed, punitive damages may only be recovered in "the narrow class of cases where the employer acts with malice or reckless indifference to the federally protected rights of its employees." *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1071 (8th Cir. 2005) (finding an award of punitive damages wouldn't be

appropriate even if the plaintiff's underlying claims survived summary judgment) (internal quotations omitted); *see also Lawrence v. CNF Transp., Inc., 340 F.3d 486, 496-97* (8th Cir. 2003) (setting aside punitive damages award); *Browning v. President of Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 636-37 (8th Cir. 1998) (same); *Karcher v. Emerson Elec. Co.*, 94 F.3d 502, 509 (8th Cir. 1996) ("We agree with [defendant] that the punitive damages claim should not have been submitted to the jury, for there was simply insufficient evidence that [defendant] acted with malice or reckless indifference to [plaintiff's] federally protected rights…") (internal quotations omitted).

This heightened standard for punitive damages mirrors that stated by the U.S. Supreme Court in *Kolstad v. American Dental Ass'n*, wherein the Court sought "to resolve a conflict among the Federal Courts of Appeals concerning the circumstances under which a jury may consider a request for punitive damages" with respect to Title VII claims. 527 U.S. 526, 533 (1999). Ultimately, the *Kolstad* Court held that employers may be subject to a punitive damages award only when it is shown they acted with "malice or reckless indifference to the plaintiff's federally protected rights." *Id*. at 535 (quoting 42 U.S.C. §1981a(b)(1)). When discussing how this standard is more demanding than the standard for justifying compensatory damages, the Court stated "Congress plainly sought to impose two standards of liability—one for establishing a right to compensatory damages and *another, higher* standard that a plaintiff must satisfy to qualify for a punitive award." *Id*. at 534 (emphasis added). As such, a plaintiff is not only required to prove their employer engaged in intentional discrimination, but that they did so with malice or "in the face of" a perceived risk that its actions would violate federal law in order to justify a punitive damages award. *Id*. at 536; *see also Karcher,* 94 F.3d at 509 (noting that "a showing of more than intentional discrimination is required to recover punitive damages) (citation omitted).[9]

[9] Noting this heightened standard for punitive damages is not limited to claims alleging violations under Title VII such as those at issue in *Kolstad*, the Court explained that "[w]ith the passage of the [Civil Rights Act of 1991],

Here, Christensen has presented no facts to suggest that Union Pacific intentionally discriminated against him—let alone that it did so with malice or reckless disregard to Christensen's rights. Christensen simply alleges that Union Pacific's determination that he was not fit for duty was incorrect and baselessly concludes that such determination constitutes a violation of the ADA.

The allegations set forth by Christensen are "in stark contrast to the type of evidence that this court has found will support an award of punitive damages." *Browning*, 139 F.3d at 637 (citing *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 575-76 (8th Cir. 1997)). In *Kimzey v. Wal-Mart Stores, Inc.*, the Eighth Circuit upheld an award of punitive damages where the plaintiff presented evidence that her superiors (1) repeatedly made crude and sexist comments to her; (2) called her highly offensive names, (3) kicked her, and (4) that she complained directly to these superiors but no action was taken. *Kimzey*, 105 F.3d at 575-76. Christensen hasn't alleged any facts that come close to the severity of those in *Kimzey*. In contrast, Christensen's claims are nothing more than a disagreement with Union Pacific's risk assessment and fitness for duty policies. Clearly, Christensen's allegations do not support an award of punitive damages, and such damages should be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Union Pacific respectfully requests that the Court grant judgment as a matter of law in its favor as to all claims asserted in Christensen's Complaint,

---

Congress provided for additional remedies, including punitive damages, for certain classes of Title VII *and ADA violations*." 527 U.S. at 534 (emphasis added); *see also Foster v. Time Warner Entertainment Co., L.P.*, 250 F.3d 1189, 1196 (8th Cir. 2001) (stating that punitive damages are only appropriate with respect to the plaintiff's ADA claim if "an employer engaged in disc discrimination with 'malice or reckless indifference to the [plaintiff's] federally protected rights.'") (quoting *Kolstad*, 527 U.S. at 526).

dismiss the Complaint in its entirety and with prejudice, award costs and fees to Union Pacific, and grant such further relief as the Court deems appropriate.

Dated this 7th day of February, 2025.

COZEN O'CONNOR

By: /s/ *Julia Gandara Simonet*
Julia Gandara Simonet
Houston State Bar No. 24093470
Kyle Hansen
Houston State Bar No. 24135519
1221 McKinney Street, Suite 2900
Houston, Texas 77010
Telephone: (832) 214-3941
Facsimile: (832) 214-3905
Email: jsimonet@cozen.com
khansen@cozen.com

William H. Walsh, Esq., WSBA No. 21911
999 Third Avenue, Suite 1900
Seattle, WA 98104
206-224-1296
wwalsh@cozen.com

*Attorneys for Defendant*
*Union Pacific Railroad Company*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with NECivR 7.1(d) (3) and further certify that the word count function was applied to include all text, including the caption, headings, footnotes, and quotations. This document was prepared using Microsoft Word 2016 and contains 10,291 words.

*/s/ Julia Gandara Simonet*
Julia Gandara Simonet

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Charles A. Delbridge – cdelbridge@nka.com
James H. Kaster - kaster@nka.com
Lucas J. Kaster - lkaster@nka.com
Caitlin L. Opperman – copperman@nka.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

None.

*/s/Julia Gandara Simonet*
Julia Gandara Simonet