IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ROSS CHRISTENSEN,<br><br>Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD CO.,<br><br>Defendant. | **8:23CV268**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on defendant Union Pacific Railroad Co.'s ("Union Pacific") Motion for Summary Judgment (Filing No. 49). *See* Fed. R. Civ. P. 56; NECivR 56.1. Plaintiff Ross Christensen ("Christensen") opposes the motion (Filing No. 61). For the reasons stated below, the motion is granted.

## I. BACKGROUND

On July 26, 2004, Union Pacific hired Christensen as a brakeman/switchman. After some additional training, he capably worked as a conductor for over ten years—most recently in Provo, Utah. The essential functions of that position included safely operating and moving trains, performing switching operations, conducting "train and equipment inspections," communicating and reporting "information concerning train movements and work orders," and interpreting signals (Filing No. 51). Christensen excelled at the job. He showed up on time, worked hard, and served the company and his customers well.

Christensen's life changed dramatically on January 9, 2015. He suffered an ischemic stroke at home that caused him to lose consciousness. He was taken by ambulance to Mountain View Hospital where he was diagnosed with aphasia and right hemiparesis. Upon transfer to Utah Valley Regional Medical Center, he was further diagnosed with atrial fibrillation. He was also later diagnosed with "an ascending thoracic

aneurysm" that measured "4.5 cm in diameter on an echocardiogram and 4.1 cm on CT angiogram of his chest" (Filing No. 51-5 at 119).

A stroke is never good, but—as Christensen thoroughly explains—he fared pretty well as he underwent initial testing and treatment. The intravenous medication (TPA) he was given to dissolve the blood clots that caused the stroke likely resulted in some bleeding in his brain, but a CT scan showed no "evident infarct"—dead or dying tissue. By January 13, 2015, most of his symptoms had resolved and he was discharged to his home rather than a rehabilitation center. At that point, Christensen had "no significant disability" and his "deficits were minimal to none."

That same day, his treating neurologist, Dr. Kevin D. Call ("Dr. Call"), cleared him to return to work as a conductor by the end of February. Dr. Call did not review the job description or a list of essential functions and did not specifically consider the risk of additional strokes before making that call. Christensen maintains he nonetheless accounted for public safety when releasing him to return to work.

On February 24, 2015, Christensen underwent three electrical cardioversion procedures for his atrial fibrillation. None of them succeeded. Dr. David Cragun ("Dr. Cragun"), Christensen's cardiologist, referred Christensen to Dr. David Wang ("Dr. Wang"), an electrophysiologist, and, on March 3, 2015, released him to return to work the next day without restrictions. Union Pacific again questions his providers' understanding and consideration of Christensen's job duties.

On April 30, 2015, Dr. Wang performed a successful ablation procedure to treat Christensen's atrial fibrillation. The procedure restored Christensen's heart to a normal rhythm. He remained free of any atrial fibrillation as of February 2016, and Dr. Wang cleared him to return to work from a cardiac perspective.

As a result of Christensen's stroke, Union Pacific's Health and Medical Services ("HMS") initiated a medical fitness-for-duty ("FFD") evaluation for him and requested his

medical records, which he promptly provided. Dr. John Holland ("Dr. Holland"), then Union Pacific's Chief Medical Officer, and Dr. John Charbonneau ("Dr. Charbonneau") reviewed those medical records for Union Pacific. They did not interview or physically examine Christensen as part of his FFD.

Based on the medical records, Dr. Charbonneau determined Christensen would need at least one year of sudden-incapacitation restrictions, directing him:

1. Not to operate company vehicles, on-track or mobile equipment, or fork-lifts.
2. Not to work on or near moving trains, freight cars or locomotives. (May walk on paths in rail yards following normal safety rules).
3. Not to operate cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee.
4. Not to work at unprotected heights, over 4 feet above the ground.
5. If a new job assignment is considered outside of the Transportation Department, [HMS] must review the job requirements and determine if the employee can safely perform the essential functions of the job.

Those restrictions prevented Christensen from working as a conductor. Dr. Charbonneau stated the restrictions were ongoing but could be reevaluated one year after the stroke, setting set Christensen's "earliest Full Duty date" as January 9, 2016. Union Pacific granted Christensen a medical leave of absence and advised him that before he would be eligible to return to work he would have to submit updated medical records regarding his neurological and cardiological conditions and undergo another FFD evaluation. To get the restrictions removed, he would have to "remain Neurologic event-free," "have a stable, detailed neurologic evaluation," and complete a cardiology follow up with testing showing "that the diameter of his thoracicaortic aneurysm is stable."

On December 21, 2015, Christensen contacted Union Pacific to begin the process to return to work. Union Pacific sent him a letter extending his medical leave of absence and requesting updated medical records, which he provided. The records included examination notes from Dr. Mohammad Entezari-Taher ("Dr. Entezari-Taher") (Filing

No. 51-5 at 78-80) describing Christensen's recovery as "excellent." Dr. Entezari-Taher also observed his balance and walking were normal and that his speech difficulty had "significantly improved." He noted Christensen had "[m]ild clumsiness in [his] right hand" but was otherwise strong and was neurologically able to return to work and drive commercially.

On March 18, 2016, Dr. Holland documented the results of Christensen's updated FFD evaluation. He found that although Christensen had not suffered another neurological event, he still continued "to have an unacceptable risk for future seizure related to his history of stroke and intracerebral hemorrhage on 1/5/2015." Based on his understanding of the risk of future seizures, Dr. Holland determined Christensen's work restrictions should remain in place for at least five years after his stroke.

In support of that decision, Union Pacific relies on the 2014 version of the Federal Motor Carrier Safety Administration's ("FMCSA") Medical Examiner's Handbook (the "Handbook"). The FMCSA is a federal agency that regulates commercial-vehicle drivers. The Handbook provides recommendations and guidelines for determining when a driver is safe to drive. With respect to the risk of future seizures for strokes, the Handbook advises a one-year waiting period if the driver is not at an increased risk for seizures and a five-year waiting period if he is. By September 2015, Union Pacific implemented a change in policy based on its decision to apply the Handbook to railroad workers in safety-critical positions.

Christensen contends Union Pacific's reliance on the Handbook is misplaced. Noting the FMCSA removed the Handbook from its website in 2015 to update it and has said the 2014 version is "no longer in use," he asserts that some of the medical information it contains is outdated. Union Pacific argues the Handbook remains a valid resource currently available from the FMCSA.

On March 18, 2016, Dr. Holland explained Union Pacific's policy change to Christensen and his wife by phone. He told them Christensen's sudden-incapacitation restrictions would remain in place but, under the new five-year waiting period, could be reassessed in January 2020.

In February 2018, Christensen—on the advice of his union representative—asked for an early reevaluation of his work restrictions. A few months later, Dr. Charbonneau reviewed the 2016 FFD evaluation and some updated medical records but found "no basis to change or remove" the existing restrictions (Filing No. 51-7 at 2). Dr. Charbonneau noted the absence of updated neurology records, but Union Pacific does not appear to have asked Christensen to provide them or to rely on their absence in denying his interim request. Christensen was never given any reason other than Union Pacific's policy change for its refusal to allow him to return to work.

Christensen avers he tried again in January 2020 by submitting what he thought were the requisite records. Union Pacific denies having received any such request in 2020. Union Pacific does not reach out to employees as their prospective return-to-work day approaches. It generally waits for them to ask.

The parties made some efforts at reconciliation in 2024, but Christensen ultimately chose not to pursue a return to work because—by then—he was approaching retirement and no longer trusted Union Pacific.

On June 16, 2023, Christensen sued (Filing No. 1) Union Pacific for damages, alleging violations of the Americans with Disabilities Act of 1990 ("ADA"), as amended as by the ADA Amendments Act of 2018 ("ADAAA"), 42 U.S.C. § 12101 *et seq.* More precisely, he asserted disparate-treatment claims under § 12112(a) and (b)(6)—though he concedes in his brief (Filing No. 61) that the latter claim can be dismissed. Christensen also clarifies that he "proceeds on the theory upheld in [*Sanders v. Union Pac. R.R.*, 108

F.4th 1055, 1059, 1061 (8th Cir. 2024)] that he was perceived to be disabled under 42 U.S.C. § 12112(a)."

Union Pacific timely answered Christensen's complaint and asserted eighteen affirmative defenses (Filing No. 6). Most pertinent here, Union Pacific averred Christensen "posed a direct threat to health and safety of himself, his coworkers, the public, and/or others that could not be eliminated by reasonable accommodation, and" Union Pacific "made an objectively reasonable medical decision" in imposing safety-related restrictions on him. *See* 42 U.S.C. §§ 12111(3), 12113(b)); 29 C.F.R. § 1630.2(r).

In addition to the information from Dr. Holland and Dr. Charbonneau, Union Pacific relies on an "expert medical review" (Filing No. 51-3) prepared by Dr. Pierre Fayad ("Dr. Fayad") for this litigation. Based on his review of Christensen's medical records, Dr. Fayad estimated Christensen's risk of suffering another stroke in the five years after the first at 5.9%. Dr. Fayad did not examine Christensen or evaluate whether any deficits prevented him from doing his job.

On February 7, 2025, Christensen moved to exclude "undisclosed expert testimony" from Drs. Holland and Charbonneau (Filing No. 43). A magistrate judge denied (Filing No. 72) the motion "without prejudice to reassertion if Union Pacific offers testimony or information" from either witness "'on a motion, at a hearing, or at trial' that was not disclosed in Union Pacific's September 25, 2023, initial disclosures or April 8, 2024, expert disclosures." The magistrate judge noted Christensen did "not point to any undisclosed information from either doctor offered by Union Pacific in support of summary judgment."

## II. DISCUSSION

### A. Standard of Review

On a motion for summary judgment, the Court views genuinely disputed facts in the light most favorable to the nonmoving party and draws all reasonable inferences in their favor. *See Green v. City of St. Louis*, 134 F.4th 516, 522 (8th Cir. 2025); *Micone v. Levering Reg'l Health Care Ctr., LLC*, 132 F.4th 1074, 1078 (8th Cir. 2025). Summary

judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Cearley v. Bobst Grp. N. Am. Inc.*, 129 F.4th 1066, 1069 (8th Cir. 2025) ("Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party presents no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.").

"At summary judgment, '[t]he moving party can satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." *Becker v. City of Hillsboro*, 125 F.4th 844, 851 (8th Cir. 2025) (alteration in original) (quoting *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018)). If it does that, the nonmoving party "must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In either case, the nonmoving party can neither "rest on mere denials or allegations" nor rely on "some metaphysical doubt about the material facts." *Bedford*, 880 F.3d at 997; *see also Johnson v. Exide Techs., Inc.*, No. 23-3528, 2025 WL 1338189, at *1 (8th Cir. May 8, 2025) ("Unsupported assertions of 'controverted' facts . . . cannot create a genuine dispute for trial.").

Not every fact dispute precludes summary judgment. *See Becker*, 125 F.4th at 851. "[R]ather, the dispute must be outcome determinative under prevailing law." *Id.* (quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). "A genuine dispute of fact is one in which a reasonable jury could return a verdict in favor of the nonmoving party." *Micone*, 132 F.4th at 1078. Absent that, summary judgment is required. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

**B. Alleged Disability Discrimination**

The operative facts in this case are unfortunate but not complicated. The undisputed record indicates Christensen was an exemplary employee in a safety-sensitive position. After he had a stroke, Union Pacific imposed sudden-incapacitation restrictions that left him unable to return to his job as a conductor for at least a year. Christensen never challenged the reasonableness of the initial one-year minimum term, even though some of his medical providers released him to return to work not long after his stroke. Instead, he bided his time and sought reinstatement when the year was almost up.

At that point, Dr. Holland advised him that Union Pacific's policy had changed and that his existing work restrictions would remain in place for a minimum of five years following his stroke. Though then willing and (at least in his view) able to return to work, Christensen was again told to wait for safety reasons. Convinced Union Pacific was either wrong or dissembling, he filed this suit under the ADA.

Christensen asserts a disparate-treatment claim under § 12112(a), which prohibits discriminating "against a qualified individual on the basis of disability in regard to" the "terms, conditions, and privileges of employment." To prove that claim, he must show "(1) he was 'disabled,' (2) he was 'qualified,' and (3) [Union Pacific] imposed work limitations because of his disability." *Sanders*, 108 F.4th at 1060. "Determining whether an individual has a qualifying disability requires an individualized analysis of the claimed disability." *Didier v. Schwan Food Co.*, 465 F.3d 838, 841 (8th Cir. 2006).

At this point, no one contends Christensen is actually disabled. Instead, he contends Union Pacific unlawfully discriminated against him because it regarded him as disabled when he tried to return to work after his stroke. As amended, the ADA prohibits discrimination on that basis. *See id.*; *Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 804 (8th Cir. 2014) (noting the ADAAA made it easier for a plaintiff to prove disability). "Under the ADA, being regarded as disabled by an employer can suffice to establish a disability within the meaning of the statute if the plaintiff shows that his

employer subjected him to an adverse action 'because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Fischer v. Minneapolis Pub. Sch.*, 792 F.3d 985, 988 (8th Cir. 2015) (quoting 42 U.S.C. § 12102(1), (3)(A)); *see also* 29 C.F.R. § 1630.2(h) (broadly defining impairment).

To survive summary judgment, Christensen must adduce either "direct evidence" of disability discrimination or sufficient indirect evidence to support a reasonable "inference of unlawful discrimination." *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012); *accord Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 545 (8th Cir. 2021) (explaining plaintiffs can "rely on either direct or indirect evidence"). Direct evidence is that which shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Hutton v. Maynard*, 812 F.3d 679, 683 (8th Cir. 2016) (quoting *Russell v. City of Kan. City*, 414 F.3d 863, 866 (8th Cir. 2005)). The adjective "direct" describes "the causal strength of the proof," not its type or nature. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). "Strong circumstantial evidence may also constitute direct evidence." *Hutton*, 812 F.3d at 684.

In this context, "animus" simply means "that the employer was motivated by the employee's disability." *Sanders*, 108 F.4th at 1062. "An inference of discrimination arises where there is some evidence of a causal connection between a plaintiff's disability and the adverse employment action taken against the plaintiff." *Lowery v. Hazelwood Sch. Dist.*, 244 F.3d 654, 657-58 (8th Cir. 2001) (quoting *Allen v. Interior Constr. Servs.*, 214 F.3d 978, 982 (8th Cir. 2000)).

Absent direct evidence, a plaintiff must establish the requisite inference of unlawful discrimination "under the burden-shifting framework provided by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Anderson v. KAR Glob.*, 78 F.4th 1031, 1036 (8th

Cir. 2023); *Griffith*, 387 F.3d at 736 (explaining the plaintiff must satisfy *McDonnell-Douglas* analysis if he "lacks evidence that clearly points to the presence of an illegal motive"). First, he must "establish a prima facie case" of disability discrimination as described above. *Anderson*, 78 F.4th at 1036. If he does, the burden of production "shifts to the employer to show a legitimate, nondiscriminatory reason for" its actions. *Id.* at 1036-37 (quoting *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016)). If it can, "[t]the burden then shifts back to the plaintiff 'to show that the proffered reason was, in reality, a pretext for discrimination.'" *Id.* at 1036-37 (quoting *Oehmke*, 844 F.3d at 755).

Here, Christensen contends he has direct evidence that Union Pacific "imposed career-ending restrictions on" him because it regarded him as disabled under the ADAAA. As he sees it, "there can be no disputing that Union Pacific imposed the final, five-year restrictions because of [his] stroke—specifically, that he had a stroke and was regarded by Dr. Holland as having an unacceptable increased risk of future seizures." He therefore denies *McDonnell Douglas* even applies. *See Bashara v. Black Hills Corp.*, 26 F.3d 820, 823 (8th Cir. 1994).

To the extent it does, he argues he has easily established his prima facie case and Union Pacific cannot assert a "legitimate, non-discriminatory reason" for imposing his work restrictions because the purported safety risk presented by the potential for seizures is a result of his stroke. *See* 42 U.S.C. § 12112(a) (requiring a plaintiff to show discrimination "on the basis of disability"); *Sanders*, 108 F.4th at 1061-62 (discussing "discriminatory animus" under the ADA); *Cushman v. Union Pac. R.R.*, No. 8:23-CV-196, 2024 WL 1094703, at *7 (D. Neb. Mar. 12, 2024). Christensen further asserts multiple facts, such as Union Pacific's policy changes, failure "to honor its promises," and shifting explanations, create a genuine dispute of material fact as to pretext. *See*, *e.g.*, *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) ("A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies,

(2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision.").

In support of summary judgment, Union Pacific challenges Christensen at every step. It denies it regarded him as disabled, rejects his take on direct evidence, and attempts to distinguish his cited authority, including *Sanders*, on factual grounds. As Union Pacific sees it, the decisions in *Morriss v. BNSF Railway Company*, 817 F.3d 1104, 1113 (8th Cir. 2016), and *Jackson v. Union Pacific Railroad Company*, No. 4:19-CV-00069-RGE-RAW, 2021 WL 1726895, at *15-*17 (S.D. Iowa Mar. 29, 2021), are a much better fit for Christensen's disability claim.

Relying on those cases and others, Union Pacific contends Christensen cannot show he was disabled under the ADA or qualified to safely perform the essential functions of a conductor. *See*, *e.g.*, *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 969 (7th Cir. 2020) ("It would defy common sense to demand that [an employer] disregard these well-documented medical opinions and allow its employees . . . to prematurely return to work, thereby jeopardizing their safety."). It further argues he fails to establish discriminatory animus, causation, pretext, or any grounds for punitive damages as a matter of law. According to Union Pacific, "the undisputed medical evidence shows Christensen had a type of stroke that creates an enhanced risk of future seizures and potential of suffering a future stroke," and it reasonably relied on the Handbook in formulating its policies and imposing five-year restrictions on Christensen to ensure safety for him, his coworkers, and the public. *See McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008) ("A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the [adverse employment action]." (quoting *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006))).

In addition to attacking what it sees as Christensen's lack of evidence of invidious discrimination, Union Pacific also leans heavily on its direct-threat defense. The ADA

allows an employer to defend against a disparate-treatment claim "on the ground that an employee poses a 'direct threat' to the health or safety of others in the workplace—that is, because of his disability, he creates 'a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Sanders*, 108 F.4th at 1062 (quoting 42 U.S.C. §§ 12111(3), 12113(b)); *see also* 29 C.F.R. § 1630.2(r).

To establish a direct-threat defense, the employer must "show that its determination that [an employee] posed a direct threat was: (1) the result of an individualized assessment, (2) objectively reasonable, and (3) based on the 'most current medical knowledge and/or on the best available objective evidence.'" *Sanders*, 108 F.4th at 1062 (quoting 29 C.F.R. § 1630.2(r)). "Specific factors to be considered include (1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) (quoting *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999)).

In Union Pacific's view, the undisputed facts in this case conclusively establish this defense. In line with its legitimate, non-discriminatory reason for imposing Christensen's sudden-incapacitation restrictions, Union Pacific maintains it conducted an individualized assessment of Christensen's circumstances after his stroke and reasonably relied on documented medical evidence and evaluations and FMCSA guidance in imposing his five-year work restrictions. It aptly notes that it does not have to show that its decision about whether Christensen could safely perform their job is correct—only that the decision was objectively reasonable at the time it was made. *See Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015).

In response, Christensen argues "fact issues preclude summary judgment on the direct threat defense because Union Pacific's fitness-for-duty evaluation of Christensen was not objectively reasonable, and it ignored objective evidence" regarding his ability to return to work in 2016, 2018, and 2020. Downplaying his heightened risk of seizures,

Christensen further contends Union Pacific has not shown any essential job function he could not safely perform. In support of his assertion that he could have safely returned to work after a year, Christensen relies on his own opinion, that of a coworker, and the medical releases he received from Dr. Call and his other treating physicians.

This is not an easy case. The nature of Christensen's disability claim and the circumstances of this case present some tricky questions with respect to disability, being qualified, direct evidence, discriminatory animus, causation, and pretext. But the Court need not dive deep into the weeds on those issues because it concludes Union Pacific has established its direct-threat defense in this case.[1] *See Wal-Mart*, 477 F.3d at 571 (explaining summary judgment is proper under the ADA if the employer establishes that the employee poses a direct threat); *McNary*, 535 F.3d at 769 (finding it unnecessary to address whether the plaintiff "established a prima facie case of discrimination" where the district court assumed she did and focused on the pivotal issue of pretext).

To start, there is no question that Christensen was in a safety-sensitive position—he was operating trains. Every day presented an opportunity for serious damage, injury, or death for Christensen, his coworkers, and the public. There is also no question that Christensen's stroke resulted in a heightened risk of seizures.

After the stroke, the HMS completed an individualized FFD evaluation for Christensen, assessing not only the nature and duration of the specific risks he faced but his ability to safely perform his job. *See* 29 CFR § 1630.2(r). Christensen alludes to some potential additional medical records, but he does not provide them let alone specifically say what that evidence showed or how it would change the analysis.

Dr. Holland's decision largely turned on Christensen's heightened risk of seizures. While the likelihood of a seizure may have been relatively low, "[t]he nature and severity

[1]For his part, Christensen contends, "Union Pacific's safety-related arguments are properly analyzed in the context of [its] 'direct threat' defense."

of the potential harm" was extreme. *Id.* And the threat of a seizure is—by nature—always imminent, even if unlikely. *See id.*

Contrary to Christensen's contention that Union Pacific "ignored" the opinions of his treating physicians, Dr. Holland and Dr. Charbonneau thoroughly reviewed his medical records and reached a reasonable medical judgment based on their own medical knowledge and the available evidence. *See Michael*, 808 F.3d at 307 ("An employer's determination that a person cannot safely perform his job functions is objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable."). Beyond his criticism of Dr. Holland's interpretation of the Handbook, Christensen neither challenges the currency or quality of the evidence the HMS considered nor identifies any other specific evidence it should have reviewed.

As for the Handbook itself, Christensen states "it is not the Handbook itself but it's application that is at issue." Yet he has not—based on this record—sufficiently explained how it was objectively unreasonable for Dr. Holland to rely on the Handbook in part as he did in formulating Christensen's work restrictions simply because it does not "provide the certainty that" Christensen thinks "Union Pacific needs" with respect to his heightened risk of seizures.

What's more, the fact that Christensen's treating physicians (or an FMCSA examiner) might have reached different conclusions than Dr. Holland and Dr. Charbonneau about the timing of his return to work does not automatically make their decisions objectively unreasonable. "Reasonable doctors of course can disagree . . . as to whether a particular employee can safely perform the functions of his job. That is why the law requires only that the employer rely on an 'objectively reasonable' opinion, rather than an opinion that is correct." *Michael*, 808 F.3d at 309 (astutely questioning whether the employee's preferred medical opinions fully reflected the specific "individualized inquiry" required to properly evaluate a direct-threat defense).

Christensen's unsupported assertion that "Union Pacific's only path to establishing their direct threat defense is to demonstrate that they can see the future, and that the future demonstrates a certainty: a clearly unacceptable risk of either another stroke or a future seizure, something which has never happened" is wholly unpersuasive. Leaving aside any ill-advised resort to "hindsight's perfect vision," *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998); *see also Wal-Mart*, 477 F.3d at 570; 29 C.F.R. § 1630.2(r) (requiring the employer to rely on "current" knowledge and "available" evidence), the Court is mindful that the direct-threat defense strikes a delicate balance between the important goal of "prohibiting discrimination against individuals with disabilities" and the need to protect "others from significant health and safety risks," *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998).

As here, "the question whether one doctor is right that an employee can safely perform his job functions, or another doctor is right that the employee cannot, will be unknowable—unless the employer runs the very risk that the law seeks to prevent." *Michael*, 808 F.3d at 309; 42 U.S.C. § 12113(b) (allowing employers to ensure that their employees do "not pose a direct threat to the health or safety of other individuals in the workplace"). The inherent medical uncertainty about stroke and seizures does not categorically bar the direct-threat defense or definitively establish unlawful disability discrimination as Christensen seems to suggest. *See Michael*, 808 F.3d at 309; *Wal-Mart*, 477 F.3d at 571.

In other words, Union Pacific does have to expose itself to substantial tort liability in the future "to avoid an ADA claim now." *Michael*, 808 F.3d at 309 (affirming summary judgment in favor of the defendant employer because it relied on objectively reasonable medical opinions and other evidence in deciding the plaintiff presented an unreasonable threat to himself and others); *cf. Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 341 (4th Cir. 2022) (recognizing that if a railroad failed to thoroughly investigate an engineer's medical

condition and that failure caused a train wreck, the railroad "would be told under the unremitting glare of hindsight of all it should have done" to prevent the tragedy).

Having carefully reviewed the parties' respective arguments and the balance of the record in this case, the Court finds no triable issue on Union Pacific's direct-threat defense. *See Matsushita*, 475 U.S. at 586-87 (requiring summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"). Therefore,

IT IS ORDERED:

1. Defendant Union Pacific Railroad Co.'s Motion for Summary Judgment (Filing No. 49) is granted.
2. This case is dismissed with prejudice.
3. A separate judgment will issue.

Dated this 23rd day of May 2025.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge